UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                :

BARRY K. BROWN,                      :

                     Plaintiff,      :              11 Civ. 7304 (PAE)

                                                  :      OPINION AND ORDER

              -v-                 :

                                                  :

RICHARD KAY, AS PRELIMINARY EXECUTOR OF   :
THE ESTATE OF HIMAN BROWN, and THE HIMAN   :
BROWN REVOCABLE TRUST, AS RESTATED,       :
RICHARD KAY, TRUSTEE, and THE HIMAN BROWN  :
CHARITABLE TRUST, RICHARD KAY, TRUSTEE,    :

                                                  :

                   Defendants.    :

                                                  :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This case involves claims relating to the art collection of the late Himan Brown

("Himan"), a well-known producer of radio and television programs.  Plaintiff Barry Brown

("Barry") is Himan's long-estranged son.  Barry brings claims of fraud and conversion against

the executor of Himan's estate ("the Estate") and against two trusts created by Himan.  In

essence, Barry alleges that Himan subverted a provision of a long-ago separation agreement

under which Himan and his ex-wife had provided that, upon the death of the latter of the two of

them, Barry and his sister were to be bequeathed 34 specific works of art.

       Defendants[1] move to dismiss the Complaint for failure to state a claim, for a variety of

different reasons, under Federal Rule of Civil Procedure 12(b)(6), and, to the extent matters

---

[1] Defendants are (1) Richard Kay, as preliminary executor of the estate of Himan Brown; (2) The
Himan Brown Revocable Trust, as restated, Richard Kay, Trustee ("the Revocable Trust"); and
(3) The Himan Brown Charitable Trust, Richard Kay, Trustee ("the Charitable Trust").

outside the pleadings are considered, for summary judgment, pursuant to Fed. R. Civ. P. 12(d)

and 56.  Defendants also move for dismissal under Fed. R. Civ. P. 19, for failure to join Barry's

sister and the estate of his mother as necessary parties.  For the reasons set forth herein, the Court

dismisses both claims in the Complaint with prejudice.

## I.  BACKGROUND[2]

### A.  Factual Background to Plaintiff's Claims

During a 65-year career that resulted in his induction in 1990 into the National Radio

Hall of Fame, Himan produced more than 30,000 radio programs for radio networks and

---

[2] Except as otherwise noted, the Court's account of the facts of this case is drawn from the Complaint and from documents incorporated therein.  To the extent the Court has resolved this case on the basis of Rule 12(b)(6), its decision is limited to the Complaint and documents incorporated therein.  To the extent the Court has converted the motion to one for summary judgment pursuant to Rules 12(d) and 56 and ruled on that basis, it has also considered two categories of information supplied by the parties.  These are:  (1) official pleadings, court decisions, and a hearing transcript relating to a 2002 lawsuit unsuccessfully brought by Barry against Himan, relating in part to the artwork at issue in this case; and (2) a 2010 "Release Agreement" resolving claims between Barry, on the one hand, and the Estate and the Revocable Trust, on the other, also relating to the artwork at issue.  For the most part, these materials have been supplied to the Court as attachments to the affidavit of defense counsel Michael B. Kramer, Esq., ("Kramer Aff."); in addition, plaintiffs have supplied the full transcript of an April 11, 2003 hearing relating to the 2002 lawsuit, of which defendants had submitted only an excerpt.  *See* Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Mem.") Ex. B.  The parties, although disputing the legal effect of these materials on the current case, do not dispute their authenticity.  For the limited purpose of addressing defendants' motion to dismiss for failure to join a necessary party, the Court has also considered an affidavit that Barry submitted in connection with the 2002 lawsuit, which plaintiff has supplied to the Court.  *See* Pl.'s Mem. Ex. A.

For purpose of explanatory background but not as a basis of its decision, the Court has reviewed and cited select factual averments in the Kramer Affidavit, the Supplemental Affidavit of Michael B. Kramer, Esq. ("Kramer Supp. Aff."), and the Affidavit of Richard L. Kay ("Kay Aff."), all submitted by defendants.  Finally, the Court has taken note of the affidavit of plaintiff's counsel Malcolm S. Taub, Esq. ("Taub Aff.").  For the most part, the Taub affidavit recapitulates verbatim, and swears to the accuracy of, the averments in plaintiff's Complaint; Mr. Taub does not, however, set forth the basis for his knowledge of these facts.

syndication.  He also produced television series, major fundraising events, and film documentaries.  He donated money and art to numerous museums and colleges.  Compl. ¶ 1.

In 1933, Himan married Mildred Brown ("Mildred").  The couple had two children: Barry, the plaintiff in this case, born in 1934, and Hilda (now Hilda Brown Lapidus) ("Hilda"), born in 1936.  Compl. ¶¶ 1, 15; Kramer Aff. ¶ 7 & Ex. F (hereinafter, "Separation Agreement"), at 1.

In 1967, Himan and Mildred divorced.  In connection with the divorce, on October 24, 1967, they entered into a separation agreement.  Compl. ¶¶ 19-22; Kramer Aff. ¶¶ 12-13; Separation Agreement.  Both parties were represented by counsel in connection with that agreement.  *See* Separation Agreement, Ex. A.[3]

The Separation Agreement contained specific provisions relating to the couple's artwork. It provided that all art in Himan's apartment at 285 Central Park West was "his sole and exclusive property."  Separation Agreement ¶ 3.  It also appended two exhibits (Exhibits C and D), which are lists of artwork.  Exhibit C consists of 11 single-spaced pages listing artwork; the agreement declared Himan "the sole and exclusive owner of the works of art" set out in Exhibit C.  *Id.* ¶ 4.

Exhibit D to the Separation Agreement, which is central to this litigation, consists of two single-spaced pages listing 34 of the works of art appearing in Exhibit C.  The Exhibit D works include pieces attributed to such masters as Degas, Modigliani, Picasso, and Renoir.  Separation Agreement Ex. D.  The agreement provided that Mildred had the right during her lifetime to possess the Exhibit D artwork.  The agreement prohibited her from selling or moving this artwork.  *Id.* ¶ 4(i).

---

[3] Mildred was represented by Roy Cohn, Esq., and his law firm, Saxe, Bacon & Bolan.  Himan was represented by Goldwater & Flynn.

Importantly, for the purposes of this litigation, the Separation Agreement obliged Himan to maintain a will bequeathing the Exhibit D artwork to Mildred if he predeceased her, and to Barry and Hilda, per stirpes, if he did not.  Symmetrically, the Separation Agreement obliged Mildred to maintain a will providing that, if Himan predeceased her, the Exhibit D artwork would be bequeathed to Barry and Hilda, per stirpes.  *Id.* ¶ 4(ii).  Thus, the Separation Agreement provided that upon the death of the latter of their parents, Barry and Hilda were to be bequeathed the Exhibit D artwork.

In 1974, Mildred died.  Compl. ¶ 25.  Under the Separation Agreement, Himan thus regained the right to possess the 34 pieces of artwork listed on Exhibit D.  Separation Agreement ¶¶ 3-4.  Himan thereafter possessed the Exhibit D artwork until his death.  Compl. ¶ 25.

In June 2010, Himan died.  Compl. ¶ 2; Kramer Aff. ¶ 19 & Ex. D.  Himan's purported last will and testament (dated October 20, 2004) named Richard Kay as executor; the Surrogate's Court of New York County has appointed Kay preliminary executor of the Estate.  Contrary to the terms of the Separation Agreement, the will did not bequeath anything to Barry or Hilda. Instead, it bequeathed Himan's entire estate to Radio Drama Network, a private charitable foundation.  Barry has interposed objections to his late father's will.  Compl. ¶¶ 3-5, 28; Kay Aff. ¶ 34 & Ex. E.[4]

### B.  Plaintiff's Claims of Fraud and Conversion

Barry brings two claims against the Estate – in Count One, for fraud, and in Count Two, for conversion.  Both relate to the Exhibit D artwork.

---

[4] Defendants represent that Himan's three preceding wills (executed in 2001, 2002, and 2003) also had left nothing to Barry.  Kramer Aff. ¶ 34.

### 1.   The fraud claim

Barry's fraud claim alleges that, before entering into the Separation Agreement, Himan had represented to Mildred that the works of art listed in Exhibit D were authentic, original pieces that had "significant value," and that "this value would ultimately be received by her children, including Plaintiff."  Compl. ¶¶ 35, 37, 57; *id.* ¶ 41.  Himan also sent an appraiser to Mildred's home, in 1971, to appraise the Exhibit D artwork; the Complaint alleges that this functioned as a further representation to Mildred that the Exhibit D artwork had substantial value.  *Id.* ¶¶ 42-43.  On the basis of Himan's representations, Mildred entered into the Separation Agreement.  *Id.* ¶¶ 37, 59.[5]

In fact, the Complaint alleges, Himan's representations to Mildred were false.  A significant number of the artworks listed in Exhibit D were "forgeries" and of "little or no value."  *Id.* ¶¶ 45, 50.  As a result of Himan's misrepresentations, however, Mildred never discovered that these artworks were forgeries; Barry did not discover this until December 2010. *Id.* ¶ 45.  Himan's misrepresentations were reckless or intentional and were designed to deceive Mildred and, eventually, to deprive his children of valuable assets.  *Id.* ¶¶ 27, 58, 60.

As to specific artwork, the Complaint alleges, 26 of the 34 artworks listed in Exhibit D are currently in storage in Long Island City, New York.  None of these are authentic and they have "little or no value."  *Id.* ¶¶ 47-48, 50.  Two others were distributed to Mildred's kin after her death – a collage by Barry's sister, Hilda, which was returned to her, and a "Portrait of Mildred," which was given to Mildred's granddaughter, Barrie Brown.  *Id.* ¶ 51(a)-(b).  Another ("Rocks on Riviera," by Armand Guillaumin) was sold at Christie's on November 4, 2010, for

---

[5] Barry alleges that Himan made the same representation to him and to "hundreds" of unspecified others.  Compl. ¶ 38.

$120,000, with the proceeds divided between Barry and his sister.  *Id.* ¶ 51(c).  Four others are missing, including artworks attributed to Edgar Degas, Chaim Gross, and August Renoir.  *Id.* ¶ 52.[6]  The final artwork, "La Maternite", a 1921 work by Pablo Picasso, is authentic.  *Id.* ¶ 54.

Barry alleges, upon information and belief, that the "replacement value" of the missing Renoir, Degas, and Gross pieces is $755,000; and that the value of the originals of the 26 forged artworks, would be approximately $26,998,750.  *Id.* ¶¶ 53, 55-56.  Barry alleges injury to himself in his capacity as a beneficiary of the Separation Agreement; he seeks damages for himself from the Estate of "not less than $27,754,750."  *Id.* ¶ 63.  Barry also seeks, in the event that the Estate is unable to satisfy such a judgment, to recover the same amount from the Revocable Trust and the Charitable Trust.  Barry alleges that during his lifetime, Himan had transferred "the major bulk of his estate" to the Revocable Trust.  *Id.* ¶ 64.  Barry makes no allegations relating to the Charitable Trust.

### 2.  The conversion claim

Barry's conversion claim is an exercise in pleading in the alternative:  It postulates facts contrary to those alleged in the fraud claim.  The conversion claim begins:

> In the event that it is conceivable that Himan Brown did deliver original and authentic Artworks to Mildred Brown at the time they entered into the Separation Agreement, then he subsequently, upon information and belief, had such Artworks copied so that Plaintiff would be left with worthless artworks at the time of Himan Brown's death.

Compl. ¶ 66.

To this end, the conversion claim alleges, Himan "retook possession" of the authentic Exhibit D artworks after Mildred's death, *id.* ¶ 67, and thereafter "creat[ed] forgeries" that he

---

[6] The four are:  (a) the bronze "Dancer" sculpture, by Degas; (b) "Woman Standing," by Gross; (c) "Seated Girl," by Renoir; and (d) "Head of Woman," an unattributed bronze African mask. *Id.* ¶ 52.

knew would eventually "depriv[e] Plaintiff of his ownership interest in the Artworks."  *Id.* ¶ 73.

The claim that the Exhibit D artworks were authentic but replaced by "worthless" works after

Mildred's death is based solely on "information and belief."  Barry does not allege when any

such alleged forging was done, save to assert that in 2006, Himan sought to engage an artist

named Stephen Gaffney to produce a painted replica of a single, unspecified artwork.  *Id.* ¶ 68.

The conversion count seeks the same damages (no less than $27,754,750) as does the

fraud count, against the same three defendants.  *Id.* ¶ 77.  The conversion count does not contain

any factual allegations regarding the Revocable Trust or the Charitable Trust.

**C.  Defendants' Motions to Dismiss**

Defendants move to dismiss Barry's fraud and conversion claims on multiple grounds.

Because some require consideration of materials outside the pleadings, defendants ask that the

motion to dismiss, where appropriate, be converted into one for summary judgment.  Mem. of

Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") 4 n.5; Reply Mem. of Law in Further

Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply Mem.") 1 n.1.  Specifically, defendants bring to

the Court's attention two prior events bearing on Barry's legal rights with respect to the Exhibit

D artwork.

First is a 2002 lawsuit that Barry brought in New York State Supreme Court in

Manhattan against Himan ("2002 Lawsuit").  There, Barry made claims, among others, relating

to the ownership of the Exhibit D artwork.  In connection with that lawsuit, Defendants submit

Barry's Complaint in that lawsuit, the Court's order dismissing the claims in that lawsuit, and a

transcript of oral argument explaining the basis of the dismissal of one such claim.  Second is an

August 2010 agreement ("2010 Release Agreement") between the Estate, the Revocable Trust,

and Barry.  That agreement resolved (and released the Estate and Revocable Trust as to) all of

Barry's claims as to the Exhibit D artwork, subject to Barry's reservation of rights to bring claims in three discrete factual scenarios. Although both the 2002 Lawsuit and the 2010 Release Agreement are, to say the least, highly relevant to his present claims, Barry's Complaint does not disclose any of these salient legal events.[7]

The relevant facts, as revealed by defendants' undisputed submissions, are laid out below.

### 1.  The 2002 Lawsuit

In 2002, Barry sued Himan, then age 91, in New York State Supreme Court. *See* Kramer Aff. ¶¶ 21-25; *id.* Ex. A (Complaint in *Barry Brown v. Himan Brown*, hereinafter, "2002 Compl.").[8]  The 2002 Complaint sought various money damages and injunctive relief against Himan, including seeking damages sufficient to vindicate what Barry claimed were promises of lifetime support and inheritance from Himan. In the 2002 Complaint, Barry made a wide range of damaging and even scandalous allegations against Himan. These included that parts of Himan's art collection had been "forcibly acquired by the Nazi SS during World War II" from

---

[7] In its only reference to such matters, Barry's Complaint states – in what appears to be an oblique reference to the 2002 Lawsuit – that "[t]he failure to bequeath the Artwork to Himan Brown's children necessitated a costly legal battle between Plaintiff and Himan Brown's 'executor,' Richard Kay, who had been Himan Brown's estate lawyer since at least the early 1970s." Compl. ¶ 30. The Complaint says nothing about the outcome of that "legal battle" and does not refer, even obliquely, to the 2010 Release Agreement. Although Barry, in his memorandum of law opposing the motion to dismiss, disputes the legal effect of the 2002 Lawsuit and the 2010 Release Agreement on his current claims, Barry does not dispute the fact of these two events or the authenticity of any of the documents submitted by defendants.

[8] As context for the 2002 Lawsuit, defendants (including Richard Kay, Himan's executor) explain that Himan, who previously had provided "ample financial support to Barry," in 1999 decided to scale back his gifts to Barry. Kramer Aff. ¶ 20. After that point, Himan and Barry became completely estranged. Barry thereupon began to make "outrageous claims" against his father, including filing the 2002 Lawsuit, "in an attempt to extort financial concessions." *Id.* ¶¶ 4(vii), 8, 20. Defendants describe the present lawsuit as "the latest in a decade-long string of vindictive, frivolous, and ill-founded actions" brought by Barry, first against his father, and now against his father's estate and trusts. *Id.* ¶ 3.

"Jewish individuals," 2002 Compl. ¶ 5; that in 1967, during the Browns' divorce, Himan

"acknowledged that he was taking unfair advantage of Mildred," *id.* ¶ 9; that Himan privately

promised that, if Barry agreed to remain neutral during the divorce, Himan would leave Barry

and his sister all of his artwork and his entire estate and would make Barry the executor of his

estate, *id.* ¶ 10.   Barry also alleges that in 1998, when he was age 64, he had "commenced

recovering memories of childhood molestation and assaults on himself as well as on Hilda,"

carried out by Himan, as well as "memories of other improper sexual acts and abuse involving

the defendant"; Barry also recalled Himan's "'loaning' the plaintiff [Barry] to a male friend for

the performance of homosexual acts and molestation."  *Id.* ¶ 18.

Himan's art collection – including the Exhibit D artworks – feature prominently in the

2002 Complaint.  As pertinent here, the 2002 Complaint alleged that under the Separation

Agreement, Barry and his sister were to "receive a significant number of pieces of artwork upon

the death of their parents," *id.* ¶ 14, but that "in breach of the separation agreement and the

parties' agreements, defendant [Himan] sold certain pieces of artwork that belonged to plaintiff,"

*id.* ¶ 21.

The first cause of action in the 2002 Complaint alleged breach of contract based on

Himan's alleged breach of the Separation Agreement; it argued that Barry was a third-party

beneficiary of that agreement and demanded that Himan "be compelled to execute a will in

accordance with the terms of the separation agreement" and enjoined from transferring any

interest, right, or title in the artwork at issue.  *Id.* ¶¶ 23-26.  The second cause of action alleged

that Himan, by selling certain artwork and ceasing financial support to Barry, had breached an

oral agreement with Barry under which Himan's "entire art collection" (necessarily including the

Exhibit D artwork) and his entire estate would be left to Barry; it sought money damages and an

[9]

injunction against transferring the artwork.  *Id.* ¶¶ 28-34.  The fifth cause of action alleged promissory estoppel, asserting that in return for Barry's promise not to sue Himan or "go[] public" about the alleged "acts of sexual and physical abuse," Himan had promised, *inter alia*, "to give plaintiff [Barry] the complete family art collection."  *Id.* ¶¶ 47-49.  The seventh cause of action, for a constructive trust, alleged, in part, that Himan held money "received from the sale of certain of the artworks as described herein" that properly belonged to Barry, and sought such money and his father's artwork.  *Id.* ¶¶ 57-63.  The eighth cause of action, seeking damages for anticipatory breach, alleged that Himan had stated that he would not comply with the divorce decree, had renounced his obligations under that agreement, and had sold "certain artwork which was promised to plaintiff."  *Id.* ¶¶ 65-69.  The 2002 Complaint ended by demanding judgment and damages including "the monies received from the sale of the artwork"; "possession of the remaining artwork"; and an order enjoining Himan "from transferring, assigning, or encumbering any interest, right, or title in any of the artwork."  *Id.* at 14.

By written order dated June 20, 2003, the Supreme Court granted summary judgment to Himan and dismissed with prejudice all of Barry's claims relating to artwork.  *See* Kramer Aff. ¶ 4(ii) & Ex. B.[9]  On November 4, 2004, that order, including the dismissal with prejudice, was affirmed, without any modification, by a unanimous panel of the Appellate Division, First Department, of the Supreme Court.  *See* Kramer Aff. ¶ 4(iii) & Ex. C.  The Appellate Division's three-paragraph opinion noted that, to the extent Barry sought enforcement of the Separation

---

[9] At argument on April 11, 2003, the Supreme Court had, *sua sponte*, dismissed the first cause of action, based on an alleged breach of the Separation Agreement.  To the extent that Barry sought injunctive relief requiring Himan "to transfer the artwork in accordance with a prior agreement," the Supreme Court noted that that request "is not a judicial controversy."  And to the extent that Barry had alleged that artwork had been sold years earlier in violation of the Separation Agreement, that claim was barred by the statute of limitations.  Kramer Aff. Ex. G, at 13-15; Pl.'s Mem. Ex. B, at 13-15.  The June 2003 Supreme Court order reflects that earlier *sua sponte* dismissal.

Agreement, to which he was not a party, "an agreement to make a will is generally enforceable only after the death of the promisor," and Barry therefore had no "vested legal right" that he could pursue during his father's lifetime. *Id.* Barry did not appeal the November 2004 Appellate Division order. Kramer Aff. ¶ 4(iv).

### 2. The 2010 Release Agreement

After Himan's death in June 2010 and the initial probating of his will, the parties (the Estate, the Revocable Trust, and Barry) entered into a broad agreement relating to the Exhibit D artwork. Kramer Aff. ¶¶ 26-33 & Ex. D.

The 2010 Release Agreement acknowledged that Himan's will, as filed with the Surrogate's Court, had failed to bequeath to Barry and his sister the works identified in Exhibit D to the Separation Agreement. The Release Agreement resolved Barry's claims to that artwork. It explains that Richard Kay – as trustee of the Revocable Trust and as preliminary executor of the Estate – wished to distribute to Barry certain works due him under the Separation Agreement; that Barry had agreed to receive such works; and that, in exchange, Barry (subject to a limited reservation of rights) had agreed to release Kay, the Estate, and the Revocable Trust "from any liability in connection with his right to receive such art and all matters whatsoever pertaining to all rights that he has or may have in and to the works of art on Exhibit D of the Separation Agreement." 2010 Release Agreement 2.[10] The agreement provided: "It is the intention of the parties hereto that, subject to the Reserved Claims described below, the artwork set forth on the List is to be accepted by BARRY BROWN in full substitution and satisfaction of

---

[10] *See also id.* ¶ 7 (releasing and forever discharging the same "from all liability whatsoever in connection with the [a]ssignment, the works of art on Exhibit D to the Separation Agreement, [and] the works of art set forth on the List"); *id.* ¶ 8 (releasing and forever discharging the same "from each and every claim, deed, or reckoning relating to or arising from the [a]ssignment, the works of art on Exhibit D to the Separation Agreement, [and] the works of art set forth on the List").

any right or claim BARRY BROWN may have in the works of art on Exhibit D to the Separation Agreement." *Id.* ¶ 1.

The Release Agreement set out an attached list of 34 artworks and gave Barry a 50% undivided interest in those artworks.  (The other 50% was for his sister.)  The Release Agreement classified two of those works (the Picasso and Guillaumin paintings identified in Barry's Complaint) as the "Valuable Art."  *Id.* at 2.  The Release Agreement authorized Barry and his sister to sell those two items of "Valuable Art" at auction at Christie's, Inc., in November 2010, as, the Release Agreement represents, Barry and his sister had already made arrangements to do.  *Id.* at 2 & ¶ 4.[11]

In the Release Agreement, Barry reserved the right, during the next five years, to bring claims as to the other 32 listed artworks from Exhibit D of the Separation Agreement if it turned out that:  (1) at any time before the agreement, the originals of any of these artworks had been sold or otherwise disposed of by Himan or on his behalf; (2) the originals of any of these artworks "are in fact extant and within the custody or control" of the Estate, the Revocable Trust, or any other entity controlled by Himan; or (3) the originals of any of these artworks had been given away as gifts to anyone other than Barry or his sister.  2010 Release Agreement ¶ 8 (identifying these as "Reserved Claims").  Preliminary executor Kay, in turn, represented and warranted that he had no knowledge (1) of any facts that would support a Reserved Claim, (2) "that any work of art on the List other than the Valuable Art was once genuine during the time that it was owned by HIMAN BROWN; (3) of the circumstances under which the forged works

---

[11] According to the consignment agreement, Christie's estimated that the Picasso painting, "La Maternite," would sell for between $9 million and $12 million, and the Guillaumin painting, "L'Ile a Agay," would sell for between $50,000 and $70,000.  Kramer Supp. Aff. Ex. 2.

of art on the List were created; and (4) that HIMAN BROWN knowingly included works of art on the List that were not genuine." 2010 Release Agreement ¶ 9.

### 3. The bases for defendants' motions

As to the fraud claim, defendants argue that it is barred (1) by the doctrine of res judicata, based on the outcome of the 2002 Lawsuit; (2) by the statute of limitations, because the fraud upon Mildred is alleged to have occurred in 1967, at the time of the Separation Agreement, and Mildred thereafter possessed the Exhibit D artwork until her death, and knew or should have known that the pieces were not authentic; (3) by the terms of the Separation Agreement, which does not represent that the listed artworks were originals and which disclaims any other representations or warranties between the parties; (4) by the New York State Dead Man's Statute (N.Y. C.P.L.R. § 4519), which prevents an interested party from testifying about transactions or communications with deceased persons; (5) by the 2010 Release Agreement and the doctrine of accord and satisfaction; and (6) because Barry has failed to plead his allegations of fraud with particularity, as required by Fed. R. Civ. P. 9(b).

As to the conversion claim, defendants argue that it (1) does not state a claim, because Himan had title at all times to the Exhibit D artwork, whereas conversion entails an unauthorized assumption and exercise of the right of ownership over goods belonging to another person; and (2) is barred by the three-year statute of limitations for conversion, based on Barry's allegations that the Exhibit D art was sold between as early as the 1960s and as late as 2006.

As to both claims, defendants move, alternatively, for dismissal under Fed. R. Civ. P. 12(b)(7) and 19, for failure to join as necessary parties (1) the Estate of Mildred Brown, because it stands in the shoes of the person, Mildred, allegedly defrauded by Himan, and (2) Barry's

sister, Hilda, because, under the Separation Agreement, she had a joint interest with Barry with respect to the Exhibit D artwork.

## II.    DISCUSSION

### A.  Applicable Legal Principles

#### 1.  Fed R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).  Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks and citation omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting that a court is "'not bound to accept as true a legal conclusion couched as a factual allegation'") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

In addition, when pleading fraud, to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  For a fraud claim "to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff

[14]

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted).  The complaint must also plead facts that give rise to a strong inference of fraudulent intent.  *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996).

### 2.  Fed. R. Civ. P. 12(d) and 56

As to conversion of defendants' motion to one seeking summary judgment, Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  "The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."  *Costor v. Sanders*, No. 07-cv-11311, 2009 WL 1834374, at *2 (S.D.N.Y. June 16, 2009) (internal quotation marks and citation omitted).

That requirement is met in this case.  Defendants submitted material outside the pleadings – specifically, the above-referenced materials relating to the 2002 Lawsuit and the 2010 Release Agreement – to the Court as attachments to affidavits submitted at the time of their motion to dismiss.  Defendants stated, and thereby gave notice to Barry, that, as a result of the submission of such materials, the Court might be obliged to treat defendants' motion as one for summary judgment.  *See* Defs.' Mem 4 n.5; Defs.' Reply Mem. 1 n.1.  Barry has not argued a lack of

[15]

notice of the possible conversion of defendants' motion to one for summary judgment.  On the contrary, Barry augmented the record as to the 2002 Lawsuit by submitting a full, rather than excerpted, transcript of a hearing in New York State Supreme Court conducted during that lawsuit.  *See* Pl.'s Mem. Ex. B.  Barry argues instead that dismissal and summary judgment are not merited.  Accordingly, the Court may properly convert defendants' Rule 12(b)(6) motion to one for summary judgment, and, as to some arguments for dismissal, has done so, as noted in the ensuing analysis, to the extent that these arguments are based upon the 2002 Lawsuit and/or the 2010 Release Agreement.

As for summary judgment, it is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  *Lesavoy v. Lane*, No. 02-cv-10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (alterations in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451,

1456 (2d Cir. 1995)).

### B.  Plaintiff's Fraud Claim

The Court finds that Barry's fraud claim is subject to dismissal for three independent

reasons.

### 1.   The fraud claim is precluded by the 2010 Release Agreement.

Barry is squarely barred from making this claim by the Release Agreement which – in

exchange for ample consideration – he entered into in August 2010.  That agreement broadly

precludes Barry from bringing any claims against the Estate or the Revocable Trust relating to

the Exhibit D artwork, except if one of three discrete circumstances applies: (1) if Himan had

sold or disposed of originals of the Exhibit D artwork; (2) if the originals of this artwork were

within the custody or control of the Estate or Revocable Trust (or any entity they controlled); or

(3) if the originals had been given away to anyone other than Barry or his sister.  2010 Release

Agreement ¶ 8, identifying these as "Reserved Claims."

None of these three Reserved Claims applies to the facts on which Barry's present fraud

claim is based.  The Reserved Claims each presuppose that Himan owned originals of the Exhibit

D artwork.  Barry's fraud claim, by contrast, repeatedly alleges that that was not true.  Rather, it

alleges that Himan lied to Mildred (among others) to the effect that the Exhibit D artwork was of

"significant value," whereas in fact it consisted of forgeries, and that he thereby defrauded her in

the 1967 negotiations.  Specifically, it states that Himan "intended to deceive Mildred Brown and

disadvantage her in the negotiations leading to the Separation Agreement "by misrepresenting to

[17]

her that the artworks covered by the Separation Agreement were true and authentic artworks."

Compl. ¶¶ 57-58; *see also id.* ¶¶ 44, 45, 59, 61-62.[12]

Disputing that the Release Agreement bars his claim, Barry makes two arguments.  First,

he attempts to recast his present fraud claim.  He characterizes it as alleging "that while Himan

Brown was in control of the artwork, he disposed of it and misrepresented that the property to be

delivered to Plaintiff had value."  Defs.' Mem. 14.  Having carefully reviewed the Complaint, the

Court finds this characterization of the fraud claim untenable and, indeed, contorted.  The plain

language of the fraud claim clearly, indeed repetitively, asserts that, as of 1967, Himan lied to

and deceived Mildred by *falsely* representing to her that the Exhibit D artworks were originals.

*See, e.g.*, Compl. ¶¶ 35, 37-40, 42-45, 57-62; *id.* ¶ 45 ("As a result of these continuing

misrepresentations, Mildred Brown never discovered for herself that a major number of the

Artworks were forgeries.").

Second, Barry argues that it is "fundamental that fraud vitiates a contract and permits the

defrauded party to rescind the contract."  Pl.'s Mem. 14-15.  But the cases on which Barry relies

are inapposite.  They address the situation in which the contract or agreement that is sought to be

enforced was itself induced or infected by fraud.  *See, e.g.*, *Gordon v. Bialystoker Ctr.*, 45

N.Y.2d 692 (N.Y. 1978) (to determine enforceability of promise of a gift, court considered role

of fraud in the making of the promise); *Ludowsky v. Shalit*, 110 N.Y.S.2d 781 (App. Div. 1st

---

[12] Although the 2010 Release Agreement precludes claims only against the Estate and the
Revocable Trust, dismissal of Barry's fraud claim against the Charitable Trust is merited as well.
To the extent the fraud claim even references the Charitable Trust, it alleges liability against the
Trust only derivatively from the liability of the Estate, and the fraud claim against the Estate is
clearly precluded by the 2010 Release Agreement.  *See* Compl. ¶ 65 (recovery sought only from
assets of the Revocable Trust and the Charitable Trust only if the Estate and the Revocable Trust
are "found to be insolvent" or "unable to satisfy a judgment").  The Complaint makes no
allegations of fraud, let alone particularized ones sufficient to meet the standard of Fed. R. Civ.
P. 9(a), against either trust.

Dep't 1985) (court considered fraud in creation of sublease agreement in action over legitimacy

of that agreement).  Although Mildred's assent to the 1967 Separation Agreement may (or may

not) have been procured by fraud, as Barry alleges, Pl.'s Mem. 16, Barry has offered no basis to

suppose that the *2010 Release Agreement*, which *he* entered into after Himan's death, was

procured by fraud.  Quite the contrary:  Far from alleging that he was deceived when he entered

into the Release Agreement, Barry's Complaint here – audaciously – ignores the Release

Agreement altogether.

Further, the circumstances surrounding the Release Agreement are inconsistent with any

supposition that Barry was defrauded to enter into that August 2010 pact:  Barry was represented

by able counsel at the time of the Release Agreement; Himan (the alleged malefactor behind the

fraud directed at Mildred) was deceased and no longer available to mislead Barry; and Barry

does not allege that any misleading statement was directed to him by representatives of Himan's

Estate or the trusts.  And the Release Agreement reflects throughout the signatories' clear

appreciation that – save for the two paintings denominated as "the Valuable Art" – the balance of

the Exhibit D art was not genuine or valuable.  *See, e.g.*, 2010 Release Agreement ¶ 9

(preliminary executor Kay represents and warrants that he has no knowledge "that any work of

art on the List other than the Valuable Art was once genuine during the time it was owned by

HIMAN BROWN").  Thus, far from being defrauded in 2010, Barry was amply on notice as of

the time he entered into the Release Agreement that the Exhibit D artwork, save the Valuable Art

(the Picasso and Guillaumin paintings), was of nominal value.

Summary judgment is therefore warranted for defendants as to the fraud claim, on the basis of the Release Agreement.[13]

### 2. The fraud claim is barred by the statute of limitations.

Barry is, independently, barred from bringing his fraud claim by the statute of limitations. The statute of limitations for fraud is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). Because the fraud as alleged by Barry was perpetrated (and hence accrued) in 1967, whether his claim is timely turns on when the statute of limitations applicable to discovery began to run. That period "'begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *Hopkinson v. Estate of Siegal*, No. 10-cv-1743, 2011 WL 1458633, at *5 (S.D.N.Y. Apr. 11, 2011) (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)). "A plaintiff need not be on notice of the entire fraud to trigger a duty to inquire," *GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 327-28 (S.D.N.Y. 2008); he need have only "sufficient operative facts" that indicate that further inquiry is necessary, *Hopkinson*, 2011 WL 1458633, at *5; *see also Hinds*

---

[13] Alternatively, Barry's fraud claim is barred, based on the Release Agreement, by the doctrine of accord and satisfaction. Under that doctrine, "[a]n accord is an agreement that a stipulated performance will be accepted, in the future, *in lieu of an existing claim*. . . . Execution of the agreement is a satisfaction." *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (N.Y. 1993) (emphasis added); *see also May Dep't Stores Co v. Int'l Leasing Corp.*, 1 F.3d 138, 140 (2d Cir. 1993) (Under New York law, "[a]n agreement of one party to give, and another party to accept, in settlement of an existing or matured claim, a sum or performance other than that to which he believes himself entitled, is an accord. The execution of the agreement is a satisfaction. Although an accord, by itself, has no effect, an accord and satisfaction bars the assertion of the original claim."). The Release Agreement, which all parties agree was executed, is clearly such an accord and satisfaction. *See* 2010 Release Agreement ¶ 1.

[20]

*Cnty. v. Wachovia Bank N.A.*, No. 08-cv-2516, 2011 WL 4344010, at *2 (S.D.N.Y. Sep. 7, 2011)

("'[i]nquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure

of the alleged scam'") (*quoting GO Comp., Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir.

2007)).

In the Court's assessment, the discovery rule here was triggered, and the statute of

limitations therefore expired, long, long ago.  As defendants properly point out, Mildred

possessed the Exhibit D art for seven years, between the 1967 Separation Agreement and her

death in 1974.  She had every opportunity to examine the Exhibit D artwork, situated in her

home, Compl. ¶ 42, and to have it inspected or appraised.  Whether or not Mildred did so – or

whether she appreciated from the outset that the Exhibit D art largely consisted of non-original

works – is unknown, and irrelevant.  What is relevant is that, as the party putatively defrauded

into entering into the Separation Agreement party, Mildred had every opportunity to discover the

fraud.  Indeed, based on the claims in Barry's fraud count, these "forged" artworks were in

Mildred's plain sight for seven years.[14]

In any event, by no later than 2002, when he brought suit in state court against his father,

*Barry* was well aware of the key pillars of a fraud claim.  *First*, based on the allegations in the

Complaint here, Barry knew that his father had held out the Exhibit D artwork as valuable art,

including to Mildred.  Barry in fact alleges that his father made that representation not only to

Mildred, but to Barry personally and "hundreds of others."  *See, e.g.*, Compl. ¶¶ 35, 37-41.

---

[14] Barry alleges that – despite having deliberately negotiated to obtain valuable artwork and
having foregone compensating benefits in the Separation Agreement in order to obtain it –
Mildred never learned that the artwork in her possession was not genuine.  Compl. ¶ 45.  Barry
does not provide a factual basis for this claim, which strains plausibility.  But, even crediting this
claim, the discovery rule would still apply.  That rule applies in the absence of actual knowledge,
where "a reasonably diligent plaintiff would have discovered the facts constituting the violation."
*Merck & Co. v. Reynolds*, 130 Sup. Ct. 1784, 1798 (2010).

*Second*, Barry knew that his father harbored fraudulent intentions towards his mother at the time of the Separation Agreement. In his 2002 Complaint, Barry, in fact, alleged not only that Himan had admitted "taking unfair advantage of Mildred" in connection with the Separation Agreement, *see* 2002 Compl. ¶ 9, but also that Himan had successfully enlisted his adult son Barry's support in a cynical conspiracy to disadvantage Barry's mother in the divorce proceedings, in exchange for Himan's promise of future support to Barry. *Id.* ¶¶ 9-14, 28, 47-48, 58, 73. And, *third*, by 2002, Barry, by his own admission, knew that much of the supposed valuable art described in Exhibit D was not in Himan's possession. *Id.* ¶¶ 21, 24-25.

To be sure, Barry's thesis of wrongdoing in the 2002 Complaint was distinct from that claimed in the present fraud count. He claimed then that his father had sold off the valuable artwork after Mildred's death, in breach of the Separation Agreement and an oral promise to Barry, whereas his fraud claim today asserts that Himan had duped her (along with Barry and "hundreds of others") to believe the Exhibit D artwork was genuine and valuable. But by no later than 2002, Barry had more than enough facts in hand to conclude that the fraud he alleges today had been perpetrated on his mother. Indeed, tellingly, in recasting Himan's wrongdoing today as fraud rather than as a breach of contract, Barry's current Complaint does not cite a single fact indicative of fraud of which Barry was not aware in 2002. Thus, to the extent that Barry today may be said to have "discovered" that his father on 1967 had perpetrated a fraud on his mother, Barry had in hand, no later than 2002, all the data he needed to make that same "discovery."

Dismissal of Barry's fraud claim is thus warranted, because both the six-year limitations period measured from accrual, and the two-year limitations period measured under the discovery rule, have long since expired.

### 3.   The fraud claim is barred by res judicata.

For closely related reasons, Barry's fraud claim is barred by the doctrine of res judicata. That doctrine provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997).  A dismissal based on res judicata is appropriate based on an assessment of the complaint at issue and prior litigations of which the Court may take judicial notice.  *See Greenwich Life Settlements, Inc. v. Viasource Funding Grp., LLC*, 742 F. Supp. 2d 446, 452 (S.D.N.Y. 2010); *Tokio Marine and Nichido Fire Ins. Co. v. Canter*, No. 07-cv-5599, 2009 WL 2461048, at *3-4 (S.D.N.Y. Aug. 11, 2009).

The 2002 Lawsuit ended in a final judgment against Barry, with prejudice, as to all claims he raised relating to his father's artwork, including the Exhibit D artwork.  That judgment was affirmed by the Appellate Division.  The issue as to res judicata is therefore whether Barry's present claim of fraud was raised, or could have been raised, in the 2002 action.  In making that judgment, the Court looks to "'whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second [action] were present in the first.'"  *Monahan v. City of New York Dep't of Corr.*, 214 F.3d 275, 289 (2d Cir. 2000) (quoting *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983)).

Based on a review of the pleadings and decision in the 2002 Lawsuit, Barry did not raise a fraud claim in that proceeding.  Rather, Barry's thesis with regard to the Exhibit D artwork was that Himan had sold, or diverted,  genuine art from that list after Mildred's death, in violation of the Separation Agreement and his oral promise to Barry, so as to disadvantage Barry.  However, it is quite clear that that fraud claim could have been raised alongside the claims that Barry

[23]

brought in 2002.  The fraud claim relates to misconduct by the same person (Himan) relating to the same artwork (the Exhibit D artwork) in violation of the same agreement (the 1967 Separation Agreement).  The 2002 Action and the present lawsuit also allege the same victim (Barry).  And, as noted above, Barry has not identified any single piece evidence of fraud acquired since 2002.

The fraud claim Barry brings today thus should, and could, have been brought in 2002, and it is therefore barred by res judicata.  *See, e.g.*, *Zito v. Fischbein Badillo Wagner Harding*, 915 N.Y.S.2d 260 (N.Y. App. Div. 3d Dep't 2011) (slip op.) (plaintiff's claim barred by res judicata because underlying events identical to those addressed by court in earlier action).

In reaching this conclusion, the Court acknowledges Barry's claim that his 2002 Lawsuit was dismissed on the ground that it was not ripe.  Pl.'s Mem. 5.  But, as a review of the decisions in that case reflects, that is true only of the first cause of action in that case, in which Barry had alleged that Himan had breached the Separation Agreement because his will did not leave the Exhibit D artwork to Barry and his sister.[15]  In affirming the dismissal as to that cause of action, the Appellate Division noted that "an agreement to make a will is generally enforceable only after the death of the promisor," and Barry during his father's lifetime therefore had no "vested legal right" to pursue such a claim.  Kramer Aff. Ex. C, 1-2.  The Appellate Division did not, however, so qualify its rulings affirming the dismissal, with prejudice, as to Barry's other causes of action, including counts two, five, seven, and eight, all of which alleged injury to Barry based

---

[15] Notwithstanding this, the Appellate Division did not disturb the Supreme Court's dismissal *with prejudice* of that claim.

on his father's sale of artwork promised to him (including artwork promised under the Separation Agreement).[16]

### C.  Plaintiff's Conversion Claim

The Court finds that Barry's conversion claim is also subject for dismissal, for three independent reasons.[17]

#### 1.  The conversion claim is barred by res judicata.

Barry's conversion claim is, clearly, barred by res judicata, because Barry's 2002 lawsuit made, effectively, the same claim as Barry makes today, and that claim was dismissed with prejudice.

As noted, the 2002 lawsuit claimed in multiple counts that, after Mildred's death, Himan had sold off the Exhibit D artwork, depriving Barry, and his sister, of their rightful ownership interest in that allegedly valuable artwork.  The current conversion claim similarly postulates that Himan retook the "original and authentic Artworks" from Mildred after her death, and replaced those artworks with forgeries or reproductions and kept the original artworks for himself, leaving Barry "with worthless Artworks at the time of Himan Brown's death," Compl. ¶ 66, and "depriving [Barry] of his ownership interest in the Artworks," Compl. ¶ 73.

The 2002 lawsuit and the current conversion claim thus both allege the same conduct, differing only as to particulars (*e.g.*, the conversion claim adds the allegation that Himan substituted worthless reproductions or forgeries for the original art) and the characterization of

---

[16] Because the Court finds that Barry's fraud claim must be dismissed for the three independent reasons set forth above, the Court has no occasion to reach defendants' other arguments for dismissal of that claim.

[17] Unlike the fraud claim, the conversion claim is preserved by the Release Agreement, because the conversion claim is based on the premise that Himan owned originals of the Exhibit D Art but did not transfer such art to Mildred at the time of the Separation Agreement.

the claim ("breach of contract" versus "conversion").  As such, the dismissal of the 2002 claims

with prejudice is res judicata.  *See, e.g.*, *Zito*, 915 N.Y.S.2d 260 (plaintiff's claims barred by res

judicata even though he had added a cause of action under the state judiciary law to his

malpractice claims, because the new cause of action is predicated on the same conduct as the

earlier-raised claim).  In any event, even if the conversion claim were not regarded as raising

literally "the same issues" as were litigated in 2002, such issues "could have been raised in that

action."  *Maharaj*, 128 F.3d at 97.

### 2.  The conversion claim fails to state a claim.

The conversion claim also fails to state a claim, and must be dismissed under Rule

12(b)(6), for two reasons.

First, Barry does not adduce any factual allegations to support this claim.  Instead, the

Complaint admits that the conversion claim is 100% conjectural.  That claim begins:  "In the

event that it is conceivable that Himan Brown did deliver original and authentic Artworks to

Mildred Brown . . . ."  Compl. ¶ 66.  Nowhere in the claim does Barry set forth any factual basis

to believe that originals of the Exhibit D artworks were ever owned by Himan, let alone that they

were sold or transferred by Himan and replaced by "forgeries" or "reproductions."

Although it is entirely proper to plead in the alternative, to have facial plausibility, a

plaintiff must plead "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

(2009); *see also S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("To survive a motion to

dismiss, however, a complaint must allege a plausible set of facts sufficient to raise a right to

relief above the speculative level."); *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, No. 09-3293-cv,

2011 WL 6317466, at *7 (2d Cir. Dec. 19, 2011) (per curiam) ("'The plausibility standard is not

akin to a probability requirement, but it asks for more than a sheer possibility that a defendant

has acted unlawfully."') (quoting *Iqbal*, 129 S. Ct. at 1949); *ATSI Communications, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (plaintiff's factual allegations must be "sufficient 'to

raise a right to relief above the speculative level'") (quoting *Twombly*, 550 U.S. at 555).  Here,

Barry's hypothetical – and, for all intents and purposes, imagined – pleading falls well short of

the requirements of *Twombly* and *Iqbal*.[18]

　　　　Second, even if this were not so, the conduct Barry postulates in the conversion claim

does not, as a matter of law, constitute conversion.  Conversion is the "unauthorized assumption

and exercise of the right of ownership over goods belonging to another to the exclusion of the

owner's rights."  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006).

Barry's conversion claim, however, is based on the thesis that Himan converted the original,

valuable art, by replacing it with "forgeries and reproductions" and, presumably, selling (or

giving away) the original art.[19]  At all times until his death, Himan undisputedly owned outright

the Exhibit D artworks (whether or not authentic).  As a matter of law, Himan could not have

committed conversion as to objects that he owned.  *See, e.g.*, *Soroof Trading Dev. Co. v. GE

Fuel Cell Sys. LLC*, No. 10-cv-1391, 2012 WL 209110, at *7 (S.D.N.Y. Jan. 24, 2012) (an

---

[18] This shortcoming is particularly glaring in light of the Release Agreement.  As noted, that
agreement presupposes that originals of the Exhibit D artwork (apart from the Valuable Art)
were never owned by Himan, while reserving Barry's right to pursue such originals in the event
that Himan's ownership of such originals came to light.  *See* 2010 Release Agreement ¶ 8.  The
conversion claim – indeed, Barry's Complaint – is devoid of any factual allegation that the
ownership by Himan of such originals has now come to light.

[19] Barry nowhere alleges that Himan continued to possess the original artwork at the time of his
death or that the Estate is currently in possession of the original artwork.  In the Release
Agreement to which Barry is a party, signatory Kay, the preliminary executor of Himan's estate,
represents that the Estate does not possess any original art (and indeed that "any work of art on
the List other than the Valuable Art was once genuine during the time it was owned by HIMAN
BROWN").  2010 Release Agreement ¶ 9.

element of conversion is that the party charged "exercised dominion or a right of ownership over property belonging to another"); *Seifts v. Consumer Health Solutions LLC*, No. 05-cv-9355, 2011 WL 4542905, at *8 (S.D.N.Y. Sep. 30, 2011) (conversion "requires that the defendant exclude the owner from exercising her rights over the goods").  Whatever cause of action Barry possibly had or has arising out of the failure of his father to bequeath the Exhibit D artwork to Barry and his sister as required by the Separation Agreement, it is not conversion.

### 3.   The conversion claim is barred by the statute of limitations.

Finally, the conversion claim is barred by the statute of limitations.  The Complaint does not state when Himan's hypothesized conversion – *i.e.*, the sale and substitution – of any original Exhibit D artwork took place.  As the Complaint openly admits, any such conversion is entirely conjectural.

Significantly, Barry, in the 2002 lawsuit, made the same allegation, that his father had sold or otherwise disposed of the Exhibit D artwork.  Absent any allegation in the Complaint of a more recent act of conversion, there is no basis to assume that any such act occurred after 2002.[20]  And as to any sale of artwork that had occurred as of 2002, the three-year statute of limitations for conversion long ago expired.[21]

---

[20] Even the 2002 date is generous to Barry:  his complaint in the 2002 Lawsuit did not allege the date of any alleged sale by his father of artwork promised to Barry, and the only sale of artwork referenced in the court transcript furnished by Barry is a 1990 sale of, apparently, an item listed on Schedule C of the Separation Agreement.  *See* Pl.'s Mem. Ex. B, at 14.

[21] In New York State, there is no discovery rule which applies to causes of action for conversion. *See, e.g.*, *Vigilant Ins. Co. of Am. v. Hous. Auth.of El Paso*, 87 N.Y.2d 36, 44 (N.Y. 1995) ("accrual [of a conversion claim] runs from the date the conversion takes place and not from discovery or the exercise of diligence to discover") (internal citation omitted).  Indeed, even if there were such a discovery rule, the statute of limitations measured under any such rule would have long ago expired, as Barry had not only discovered the precipitating facts as of 2002, but brought the 2002 Lawsuit on the basis of them.

### D. Failure to Join a Necessary Party

Defendants alternatively seek dismissal under Federal Rule of Civil Procedure 19, based on the Complaint's failure to join the Estate of Mildred Brown, and Barry's sister, Hilda. A person must be joined as a necessary party, if feasible, if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Where the Court determines that a party is necessary, it "must order" that the party be joined. Fed. R. Civ. P. 19(a)(2); *Jota v. Texaco, Inc.*, 157 F.3d 153, 162 (2d Cir. 1998) ("Rule 19(a) requires the Court to join any person who is necessary to effect 'complete relief,' where such joinder is feasible"); *Greenwich Life Settlements, Inc.*, 742 F. Supp. 2d at 455-56. Where it is not feasible to join the absent party, the Court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

To the extent that defendants' Rule 19 motion is based on a failure to join the Estate of Mildred Brown, the Court denies that motion. It is undisputed that from 1967 forward, Mildred had no more than a possessory interest in the Exhibit D artworks. Thus, her estate has no ownership interest implicated by the current controversy. To the extent Barry alleges (in the fraud claim) that Mildred was deceived by Himan to believe that the artwork that he promised in the Separation Agreement to leave to the two children was more valuable than it actually was, that injury today falls upon Barry and Hilda, not on Mildred's Estate. Her estate's absence from this litigation does not prevent the Court from "accord[ing] complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A), and her estate has not "claim[ed] an interest relating to the

subject of [this] action."  Fed. R. Civ. P. 19(a)(1)(B).  In any event, 45 years after Mildred's death, it is not feasible to join her estate, and, if not otherwise deficient, this action could in equity and good conscience proceed without it.  Fed. R. Civ. P. 19(b).

However, the opposite conclusion inheres as to Barry's sister, Hilda.  Barry's claim of injury as articulated in the Complaint derives entirely from his role as a third-party beneficiary of the Separation Agreement.  That agreement provided that Barry and his sister were to inherit, jointly, the Exhibit D artwork upon the death of the latter of their parents.  Any interest Barry claims as to that artwork is, thus, a joint interest with his sister.[22]  Notably, Barry's Complaint demands judgment in Barry's favor against the defendants, but does not seek any relief for his sister.  And, strikingly, despite Barry's only half-interest in the Exhibit D artwork,  the Complaint demands judgment in Barry's favor for "not less than $27,754,570," which it alleges is the full value of the Exhibit D artwork at issue.  Compl. ¶ 12.  Barry offers no explanation for his demand that a court or jury, effectively, award Hilda's half-interest to Barry.

Under these circumstances, Hilda would be a necessary party to this litigation, were the Complaint not otherwise fatally deficient.  She has an interest identical to Barry's.  Assuming that a verdict and judgment for $27,754,570 in Barry's favor were returned against Himan's Estate and the trusts, the defendants would be left exposed to a parallel action by Hilda for her 50% interest.  This case thus presents a classic example where joinder is necessary in the interest of affording complete relief among existing parties, Fed. R. Civ. P. 19(a)(A), and to avoid "leav[ing] an existing party subject to a substantial risk of incurring double, multiple, or

---

[22] The Release Agreement – which provides for the proceeds of the sales of the Valuable Art, *i.e.*, the Picasso and Guillaumin paintings, to be shared equally between Barry and his sister – confirms this understanding.  *See* 2010 Release Agreement ¶¶ 5-6.

otherwise inconsistent obligations."  Fed. R. Civ. P. 19(a)(B).  To this, Barry offers no

persuasive rejoinder.[23]

### E.  Candor with the Court

The Court is, finally, compelled to express its disappointment in the conduct of Barry and

his counsel in filing this Complaint without disclosing therein the fact of the 2010 Release

Agreement.  Barry entered into the Release Agreement with the defendant Estate and the

defendant Revocable Trust just six weeks before he filed this Complaint.  The Release

Agreement resolves Barry's rights, as against the Estate, with respect to the Exhibit D artwork –

the subject of this case.  And, as discussed herein, the Release Agreement squarely bars Barry's

fraud claim here.  As a matter of basic candor with the Court and professional responsibility, it

was incumbent on Barry and his counsel to disclose the fact of that agreement and to explain

why the claims he brought were, purportedly, preserved by that agreement.

---

[23] Barry states only that "[d]ue to jurisdictional constraints, Plaintiff cannot obtain relief against
the Defendants in a forum in which Hilda could involuntarily be joined."  Ds.' Mem. 24.  Barry
does not explain this conclusory statement.  Notably, Barry has supplied the Court with an
affidavit he submitted in the 2002 Lawsuit, to which his sister was also not named as party.  In
that affidavit, Barry represented that, if necessary, his sister nevertheless "agrees to join this
lawsuit."  Ds.' Mem. Ex. B, at ¶ 6.  Tellingly, Barry has made no such representation in this case.
Indeed, while vigorously opposing defendants' Rule 19 motion, Barry nowhere represents that
his sister is even aware of the fact of this lawsuit.  *See* Pl.'s Mem. 22-25.

III.    **CONCLUSION**

For the various reasons stated in the foregoing, plaintiff's complaint is dismissed, with prejudice.[24]

The Clerk of the Court is directed to terminate the motion at docket entry number five and to close this case.


SO ORDERED.

_Paul A. Engelmayer_
_____
Paul A. Engelmayer
United States District Judge


Dated: February 9, 2012
      New York, New York

---

[24] To the extent the Court has dismissed (or granted summary judgment to defendants on) plaintiff's claims based on res judicata, the statute of limitations, or the Release Agreement, these dismissals are, by their nature, with prejudice.  In addition, this Court's Individual Rules provide that upon receipt of a motion to dismiss, a plaintiff may either exercise his right to amend the complaint, or, alternatively, oppose the motion to dismiss, thereby giving up his right to amend.  _See_ Judge Paul A. Engelmayer's Individual Rules and Practices in Civil Cases, Rule 3F, _available at_ http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=568.  Here, Barry elected to rely on his complaint as originally pled.